**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE: THE MORTGAGE STORE, INC., *Debtor*. | No. 13-16020 |
| | Nos. CV 12-0653 JMS KSC; 10-03454 (Chapter 7) |
| MANO-Y&M, LTD., *Appellant*, | Adv. Pro. No. 10-90146 |
| v. | |
| DANE S. FIELD, Trustee; GEORGE W. LINDELL; KAREN K. LINDELL; HECTOR & ALICIA INVESTMENTS, LLC; HECTOR GUERRA, *Appellees*. | OPINION |

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding

Argued and Submitted
October 7, 2014—Honolulu, Hawaii

Filed December 5, 2014

Before: A. Wallace Tashima, Johnnie B. Rawlinson,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Tashima

## SUMMARY[*]

### Bankruptcy

The panel affirmed the district court's decision affirming the bankruptcy court's summary judgment in an adversary proceeding seeking avoidance of a fraudulent transfer.

Applying the "dominion test," the panel held that under 11 U.S.C. § 550, appellant Mano-Y&M Ltd. was the initial transferee, rather than a subsequent transferee, of $311,065.25 paid by the bankruptcy debtor, The Mortgage Store, Inc., in connection with the sale of a shopping plaza. The panel concluded that *McCarty v. Richard James Enters., Inc. (In re Presidential Corp.)*, 180 B.R. 233 (9th Cir. BAP 1995), which applied in part the "control test" for identifying initial transferees, is no longer good law.

### COUNSEL

Christopher J. Muzzi (argued) and Leila Rothwell Sullivan, Tsugawa, Biehl, Lau & Muzzi, Honolulu, Hawaii, for Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Simon Klevansky (argued), Alika L. Piper, and Nicole D. Stucki, Klevansky Piper, LLP, Honolulu, Hawaii, for Appellee Dane S. Field.

**OPINION**

TASHIMA, Circuit Judge:

Appellant Mano-Y&M, Ltd. ("Mano") appeals from the judgment of the district court holding that under 11 U.S.C. § 550 Mano was the initial transferee of $311,065.25 paid by the debtor, The Mortgage Store, Inc., in connection with the sale of a shopping plaza. We affirm.

I.

Mano owned the Raymondville Plaza, a six-acre shopping plaza in Raymondville, Texas. In 2008, Mano was approached by representatives of George Lindell ("Lindell") who offered, on Lindell's behalf, to buy the plaza. In mid-December 2008, Mano and Lindell entered into a contract for Mano to sell the plaza to Lindell for $2.2 million. Lindell was to pay $300,000 cash; the remainder of the purchase price was to be covered by a seller-financed mortgage. The contract obligated both parties to pay fees associated with closing. Additionally, Lindell was to pay $10,000 of the purchase price immediately as earnest money. The contract was signed by Lindell and Paulrajan Manoharan on behalf of Mano.

The contract also assigned responsibilities to two third-parties. First, Sierra Title Company ("Sierra"), listed as the "title company" in the contract, was to take possession of the

earnest money after the contract was signed and distribute it to the appropriate party upon closing or cancellation of the contract. Second, attorney Mark Freeland ("Freeland") was assigned responsibilities related to the closing. Freeland was to receive the purchase money, distribute that money according to the contract, record the deed and closing documents, and distribute documents and copies according to the parties' instructions. Prior to and after the execution of the contract, Freeland apparently served as Mano's attorney on other matters. However, under the contract Freeland was entitled to payment from both Mano and Lindell.

The contract provided for a 30-day inspection period following its "effective date," defined as the date of "the last of the signatures by Seller and Buyer . . . and Title Company." During this period, Lindell had the right to terminate the contract for any reason, but after the 30-day period expired, Lindell was contractually obligated to purchase the property from Mano. The contract itself was not dated, but the district court concluded that the contract's effective date was no later than December 16, 2008, because that was the date on which Freeland sent the signed contract and the earnest money to Sierra. *In re the Mortg. Store, Inc.*, Civ. No. 12-0653 JMS, 2013 WL 1680636, at \*2 (D. Haw. Apr. 16, 2013). Thus, based on the contract and its effective date, the thirty-day inspection period was to end no later than January 15, 2009.

Lindell did not terminate the contract during the inspection period. On January 19, 2009, a few days after the end of the inspection period, Mano, Lindell, and Freeland executed a settlement statement to close the contract. Several other documents were also executed on January 19. Paulrajan Manoharan, on behalf of Mano, signed a special warranty

deed granting the property to Lindell. Lindell executed an assignment of rents and a promissory note for $1.9 million to Mano, and a deed of trust to Freeland as trustee. Additionally, Yalini Manoharan, Paulrajan Manoharan's wife, signed the deed on behalf of Mano the following day.

On January 20, 2009, The Mortgage Store wired $311,065.25 to Freeland in satisfaction of Lindell's obligations under the contract. Freeland deposited the money in a trust account he held with Compass Bank. The parties dispute who was entitled to receive this money under the settlement agreement. Mano contends that $34,635.42 of the transfer was intended to cover closing costs Lindell owed to entities *other than* Mano, including the Mosley Insurance Agency, Sierra, and Freeland. Appellees contend that because Lindell owed Mano $290,000 under the contract at the time of the transfer, and the transfer was for $311,065.25, the maximum amount of the transfer that could have been intended for recipients other than Mano was $21,065.25. On January 21, 2009, Freeland disbursed the money paid by The Mortgage Store pursuant to the contract.

Lindell had a longstanding relationship with The Mortgage Store. Lindell was the sole shareholder and president of The Mortgage Store from 1996 to 2008. In 2009, Lindell transferred ownership and management to his daughter, but he retained control over The Mortgage Store's finances. On the other hand, Mano contends that it had no contact with The Mortgage Store before December 2010.

In November 2010, The Mortgage Store filed for bankruptcy protection under Chapter 7. After an audit, it became clear that The Mortgage Store was operating a Ponzi scheme. The trustee, Dane S. Field, commenced this action in December 2010, alleging that The Mortgage Store's

transfer in connection with the plaza transaction was fraudulent under 11 U.S.C. §§ 544(b), 548(a)(1), and Haw. Rev. Stat. § 651C-4(a), and seeking to avoid the transfer and recoup the funds from Mano. On the trustee's motion for summary judgment, the bankruptcy court held that the transfer was fraudulent; it later determined that Mano was the initial transferee, rather than a subsequent transferee. Mano appealed to the U.S. District Court for the District of Hawaii, which (1) affirmed that Mano was an initial transferee, and (2) refused to consider Mano's alternative argument that it should not be held responsible for the entire $311,065.25 amount because Mano waived the argument by not raising it in the bankruptcy court. *In re the Mortg. Store*, 2013 WL 1680636 at *7, *10. Mano now appeals the district court's judgment to this Court.

## II.

We review the district court's decision on an appeal from the bankruptcy court de novo. *Feder v. Lazar (In re Lazar)*, 83 F.3d 306, 308 (9th Cir. 1996). We apply the same standard of review to the bankruptcy court's findings as did the district court. *Id.* Findings of fact are reviewed under the clearly erroneous standard of review and legal conclusions are reviewed de novo. *Id.* Because this dispute was decided on summary judgment, we must determine whether "viewing all evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

III.

A.

We first address Mano's argument that it was not the initial transferee under 11 U.S.C. § 550. Pursuant to § 550(a), the trustee of an entity in bankruptcy may avoid certain transfers made by the debtor from "the initial transferee of such transfer or the entity for whose benefit such transfer was made." Under § 550(a), "[t]he trustee's right to recover from an initial transferee is absolute." *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195, 1197–98 (9th Cir. 1997). A trustee may recover from a subsequent transferee – that is, any transferee not an initial transferee – but the subsequent transferee will be allowed to assert affirmative defenses that, if successful, will prevent recovery. 11 U.S.C. § 550(b)(1); *see Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir. 1991). Whether the transfer was avoidable and whether Mano's affirmative defenses would succeed are not at issue in this appeal. Rather, we must determine only whether Mano was the initial or a subsequent transferee of the funds remitted by The Mortgage Store as partial payment for the plaza sale.

Section 550(a) does not define the term "initial transferee." In the absence of a statutory definition, we apply the so-called "dominion test" to determine whether a party is the initial transferee. *Universal Serv. Admin. Co. v. Post-Confirmation Comm. of Unsecured Creditors of Incomnet Commc'n Corp. (In re Incomnet)*, 463 F.3d 1064, 1071 (9th Cir. 2006). "Under the dominion test, a transferee is one who . . . has dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 1070 (9th Cir. 2006) (quoting *Abele v. Modern Fin. Plans Serv., Inc. (In re*

*Cohen)*, 300 F.3d 1097, 1102 (9th Cir. 2002)) (internal quotation marks omitted). Key in the dominion test is "whether the recipient of funds has legal title to them" and whether the recipient has "the ability to use [the funds] as he sees fit." *Id.* at 1071. As the Seventh Circuit explained in the widely-cited case *Bonded Financial Services, Inc. v. European American Bank*, an individual will have dominion over a transfer if, for example, he is "free to invest the whole [amount] in lottery tickets or uranium stocks." 838 F.2d 890, 894 (7th Cir. 1988); *see In re Incomnet*, 463 F.3d at 1070 (characterizing *Bonded Fin. Serv.* as the "leading case in this area"). The first party to establish dominion over the funds after they leave the transferor is the initial transferee; other transferees are subsequent transferees. *See In re Cohen*, 300 F.3d at 1102–07; *In re Bullion Reserve*, 922 F.2d at 547–49.

Mano does not dispute that the dominion test is the proper method for determining the initial transferee, but, relying on *McCarty v. Richard James Enters., Inc.* (*In re Presidential Corp.)*, 180 B.R. 233 (9th Cir. BAP 1995), it argues that a party should be deemed the initial transferee when another party receives and distributes funds on its behalf.

In *In re Presidential*, Manoukian, the sole shareholder of Presidential Corp., directed Presidential to transfer a sum of money to an escrow agent to pay for his personal residence. *Id.* at 234–35. The escrow agent received the money and held it in escrow until the transaction closed, at which time the escrow agent distributed the money to parties entitled to payment under the contract, including Richard James Enterprises ("Richard James"). *Id.* After Presidential went bankrupt, the trustee sought to avoid the transfer to Richard James and the issue became whether Manoukian or Richard

James was the initial transferee. *Id.* The Ninth Circuit Bankruptcy Appellate Panel ("BAP") reasoned that "[w]here a principal controls the disposition of funds through an agent . . . the dominion or control test has been met." *Id.* at 238. Although Manoukian could not exercise direct control over the funds nor "change his mind as to their disposition," they "were *not* beyond Manoukian's dominion or control in another sense, however, because he was applying them for his personal benefit in accordance with his sole wishes." *Id.* The BAP concluded that Manoukian, not Richard James, was the initial transferee. *Id.*

The facts of *In re Presidential* resemble those here, so it is necessary for us to address *In re Presidential*'s continuing validity as precedent. Although we "treat the BAP's decisions as persuasive authority," we are not bound by its decisions. *State Comp. Ins. Fund v. Zamora (In re Silverman)*, 616 F.3d 1001, 1005 n.1 (9th Cir. 2010). In fact, as the BAP has recognized, our decisions are binding precedent that the BAP must follow. *See Ball v. Payco Gen. Am. Credits, Inc. (In re Ball)*, 185 B.R. 595, 597 (9th Cir. BAP 1995) ("We will not overrule our prior rulings unless a Ninth Circuit Court of Appeals decision, Supreme Court decision or subsequent legislation has undermined those rulings.).

In 1995, when *In re Presidential* was decided, we employed a hybrid "dominion and control" test to identify initial transferees. *See In re Video Depot*, 127 F.3d at 1199–1200. Although this test included elements of the dominion test, it also drew from the alternative "control test," which "requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." *Nordberg v. Societe Generale (In re Chase*

*& Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir. 1988); *see In re Incomnet*, 463 F.3d at 1070–71. The control test, which has had influence in our sister circuits, "is a very flexible, pragmatic one" that does not depend on "facial appearance[s]." *Andreini & Co. v. Pony Express Delivery Servs. (In re Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296, 1302 (11th Cir. 2006) (quoting *In re Chase & Sanborn*, 848 F.2d at 1199). However, in *In re Incomnet*, we explicitly rejected the control test's flexible, equitable approach and embraced the pure dominion test. *See In re Incomnet*, 463 F.3d at 1071. In so doing, we clarified that the touchstones in this circuit for initial transferee status are legal title and the ability of the transferee to freely appropriate the transferred funds. *Id.*

Although *In re Presidential* referenced both the dominion test and the control test, the panel's reasoning aligned more closely with the control test. *See In re Presidential*, 180 B.R. at 238–39. Rather than focusing on Manoukian's ability to direct the funds to whatever legal end he desired, as our most recent precedents require, the BAP's analysis turned on whether the funds were being applied for Manoukian's *benefit* and in accordance with his prior wishes. *Id.* Such equitable considerations fit much more comfortably under the control test. *Cf. In re Pony Express Delivery Servs.*, 440 F.3d at 1303 (placing weight, under the control test, on the "purpose" of a disputed transfer). Put differently, had the BAP in *In re Presidential* applied the pure dominion test as later articulated in *In re Incomnet*, it would have been compelled to deem Richard James the initial transferee. Because we conclude that the BAP's conclusions rested primarily on the control test, we now hold that *In re Presidential* is no longer good law in this Circuit insofar as it conflicts with the pure dominion test articulated in *In re*

*Incomnet*.    Accordingly, Mano's reliance on *In re Presidential* is misplaced.  The proper standard is the *In re Incomnet* dominion test.

B.

We now apply the dominion test to the facts of this case to ascertain which party was the initial transferee.  Mano asserts that Lindell was the initial transferee and argues that Lindell had dominion over the funds from the time they were received by Freeland to the time Freeland transferred them to the parties so entitled under the contract.  Although Lindell did not actually possess the funds, Mano argues that Freeland's receipt and distribution of the funds on Lindell's behalf was sufficient to give Lindell dominion.

In evaluating this assertion, we note first that Lindell never held legal title to the funds at issue, a factor the *In re Incomnet* court identified as highly significant in the dominion analysis.  *In re Incomnet*, 463 F.3d at 1073; *see also In re Cohen*, 300 F.3d at 1102.  Lindell may have had some equitable interest in the funds while they were in Freeland's possession, but that interest was too constrained to satisfy the dominion test.  Because the conditions precedent for the contract's consummation had been satisfied by the time The Mortgage Store transferred the funds to Freeland, Lindell had no right to control their distribution.  Lindell could not have prevented the distribution of funds to Mano, much less chosen to invest them in "lottery tickets or uranium stocks." *Bonded Fin. Serv.*, 838 F.2d at 894.  Ultimately, whether Freeland was acting on Lindell's behalf when he received the funds from The Mortgage Store and distributed them is irrelevant to whether Lindell had dominion.  What matters is whether Lindell had the ability to manipulate the

funds on his own accord. *See In re Incomnet*, 463 F.3d at 1071–73. The record shows Lindell did not. Because we conclude Lindell was not a transferee and Mano has not argued that any other party was the initial transferee, we hold that the district court did not err in deeming Mano the initial transferee of the disputed funds.

We acknowledge that the result this case produces may seem harsh, given that Mano was not involved in the impropriety that brought about the trustee's action. However, Congress' intent in enacting § 550 and our precedents construing it compel judgment for appellees. In virtually every case involving a bankrupt entity, a third party will be injured because the debtor's obligations to creditors, by definition, outstrip its assets. In the case of a debtor's fraudulent conveyance, injury must fall on either the transferee of the conveyance or the debtor's creditors. For creditors, letting a fraudulent transfer lie would result in a "last-minute diminution[ ] of the pool of assets in which they have interests." *Bonded Fin. Serv.*, 838 F.2d at 892. The aim of § 550, and this Court's aim, to the extent our discretion is not constrained, must be to allocate risk such that the parties tending to have the lowest monitoring costs must bear the costs of a debtor's failings. *Id.* at 892–93; *see Durkin v. Shields (Imperial Corp. of Am.)*, No. 92-1003-IEG, 1997 WL 808628, at *8–*9 (S.D. Cal. Aug. 20, 1997).

In distinguishing between initial and subsequent transferees, Congress determined that, as between creditors and transferees, "[t]he initial transferee is the best monitor." *Bonded Fin. Serv.*, 838 F.2d at 892. Unlike subsequent transferees, who "usually do not know where the assets came from and would be ineffectual monitors if they did," initial transferees tend to have relationships and influence with the

debtor. *Id.* at 892–93; *see also In re Video Depot*, 172 F.3d at 1199 ("An initial transferee is exposed to stricter liability than a subsequent transferee because the initial transferee is in the best position to evaluate whether the conveyance is fraudulent.")*.* By placing the risk on initial transferees rather than creditors, Congress ensured that creditors "need not monitor debtors so closely," the idea being that "savings in monitoring costs make businesses more productive." *Bonded Fin. Serv.*, 838 F.2d at 892 (citing Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand. L. Rev. 829 (1985); Robert Charles Clark, *The Duties of the Corporate Debtor to Its Creditors*, 90 Harv. L. Rev. 505, 554–60 (1977)); *see also Tese-Miller v. Brune (In re Red Dot Scenic, Inc.)*, 293 B.R. 116, 121 (S.D.N.Y. 2003) (noting that strict liability for initial transferees "lowers the cost of credit"). We need not weigh the merits of this trade-off because Congress' intent is clear in § 550's text. It would be inappropriate for us to second-guess Congress' considered judgment on this matter of policy.[1] *See Clark v. Balcor Real Estate Fin., Inc. (In re*

---

[1] Holding Mano liable also comports with the broader purposes of § 550. Although Mano asserts it did not have direct contact with the debtor until well after the transfer, Mano was represented by counsel in the transaction and entered a contract that allowed Lindell to satisfy his obligations under the contract through a third party. In so doing, Mano accepted the risk that Lindell's obligation would be satisfied through an avoidable conveyance. *Cf. Scholes v. Lehmann*, 56 F.3d 750, 761 (7th Cir. 1995) (noting that conveyance recipients could hold cash reserves or obtain liability insurance to hedge against the possibility of a fraudulent conveyance).

Moreover, accepting Mano's proposed resolution to this case and deeming Lindell the initial transferee would raise troubling implications. Lindell, the record indicates, was the long-time president of The Mortgage Store and maintained close ties with the company when the transfer

*Meridith Hoffman Partners)*, 12 F.3d 1549, 1557 (10th Cir. 1993) (explaining, in the bankruptcy context, that "courts' equitable powers do not permit them to disregard the clear language of the statute, regardless of how unfair it may seem to be").

IV.

Mano argues in the alternative that it should not be held responsible for the entire $311,065.25 transfer because some of that amount was received by parties other than Mano. We decline to address the merits of this argument because Mano waived it by failing to raise the issue in the bankruptcy court.

In general, "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). A litigant may waive an issue by failing to raise it in a bankruptcy court. *See Kieslich v. United States (In re Kieslich)*, 258 F.3d 968, 971 (9th Cir. 2001); *Price v. Lehtinen (In re Lehtinen)*, 332 B.R. 404, 411 (9th Cir. BAP 2005). We have discretion to consider arguments raised for

---

occurred. Given these ties, it is unreasonable to assume that Lindell had the proper incentives to monitor The Mortgage Store for fraud. Yet naming Lindell the initial transferee would make precisely that assumption. *See Bonded Fin. Serv.*, 838 F.3d at 892–93. Most instances in which one party covers another party's contractual obligations likely arise from a close relationship. Charging a party with monitoring for fraud the entity that pays its debts, as Mano suggests, thus would undermine the very structure of § 550. *Cf. In re Video Depot*, 127 F.3d at 1199 (noting that a rule making "every agent or principal of a corporation . . . the initial transferee when he or she effected a transfer of property in his or her representative capacity" would "give[ ] too much power to an unscrupulous insider to effect a fraudulent transfer" (quoting *Richardson v. FDIC (In re M. Blackburn Mitchell, Inc.)*, 164 B.R. 117, 128 (Bankr. N.D. Cal. 1994))).

the first time on appeal, but do so only if there are "exceptional circumstances." *El Paso City of Tex. v. Am. W. Airlines, Inc. (In re Am. W. Airlines)*, 217 F.3d 1161, 1165 (9th Cir. 2000). We will address a waived issue (1) when review is required to "prevent a miscarriage of justice or to preserve the integrity of the judicial process," (2) "when a new issue arises while appeal is pending because of a change in the law," and (3) "when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (quoting *Bolker v. Commissioner*, 760 F.2d 1039, 1042 (9th Cir. 1985)).

In this case, Mano made no mention of the alternative argument in its memoranda opposing summary judgment in the bankruptcy court. No change in law occurred while this case was pending that would justify this failure to raise the issue. Whether Mano is liable for the entire transfer from Freeland is not a pure issue of law; rather, it is a disputed and poorly developed factual question. No miscarriage of justice is apparent. Accordingly, we deem Mano's alternative argument waived and do not exercise our discretion to consider the issue.

## V.

For the foregoing reasons, we conclude that the district court did not err in  determining that Mano was the initial transferee of the disputed funds and in  declining to address Mano's alternative argument because it was waived. The judgment of the district court is **AFFIRMED**.